[664 NYS2d 587]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SIXTO
LA FONTAINE, Appellant.

First Department, November 6, 1997

## APPEARANCES OF COUNSEL

*Anita Khashu* of counsel, New York City *(Claudia S. Trupp* on the brief; *Daniel L. Greenberg,* attorney), for appellant.

*Patrick E. Cox* of counsel, New York City *(Nancy Strohmeyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

MAZZARELLI, J.

At issue on this appeal is whether the defendant's extraterritorial arrest in New York, by New Jersey detectives armed with arrest warrants issued by both State and Federal courts in New Jersey, was lawful. We must also decide whether a violation of this State's statutes conferring the power to arrest on certain classes of persons requires the remedy of suppression for any evidence obtained during an arrest in violation of those statutes. Because we answer the first question affirmatively, and the second negatively, we affirm both the hearing court's denial of suppression and the judgment of conviction.

The facts are uncomplicated. The record shows that at the time of the arrest, the defendant and one Miguel Ortiz were charged in New Jersey with the felony crimes of conspiracy to commit murder and aggravated assault. A New Jersey court had issued arrest warrants for them. New Jersey officers had also obtained a Federal warrant, from the New Jersey Federal District Court, for the Federal crime of flight to avoid prosecution.

On November 18, 1992, four New Jersey officers from the Paterson, New Jersey, Police Department went to the area of Manhattan covered by the 34th Police Precinct to execute the arrest warrants. After unsuccessfully searching for both defendants with the assistance of the New York City Police Department, the New Jersey officers continued their surveillance by themselves. Based on an informant's tip regarding defendant's whereabouts, they went to 600 West 163rd Street, apartment 34. Two officers stood at the door to the third floor apartment, one officer stood at the hallway window and one officer positioned himself on the second floor fire escape. The two officers knocked on the door and when asked who was there, responded "police." They heard "shuffling" noises inside, and then heard the officers stationed at the window and fire escape each yell "halt." Defendant, shirtless, was climbing out of the window and onto the fire escape. He was apprehended by the officer one flight below. Hearing a child crying inside the apartment from which defendant had fled, the officers escorted defendant back through the window into apartment 34 and observed plastic bags of cocaine in plain view on the refrigerator. The New Jersey officers turned the narcotics over to the 34th Precinct, and defendant was ultimately indicted by a New York County Grand Jury for the crime of criminal possession of a controlled substance in the third degree.

Defendant moved to suppress the narcotics on the grounds that the New Jersey officers, not in close pursuit, were without authority to make arrests or execute warrants in New York. After the parties briefed the issue, the court denied the motion to suppress in a written opinion. It held that although the New Jersey officers could make an arrest in New York as private persons, they did not do so here because they had invoked their official authority in coercing defendant from his home and arresting him. The court also ruled that the New Jersey warrant had no effect outside that State's borders and was therefore invalid. However, the court determined that the Federal arrest warrant validated the arrest, since such warrants may be executed anywhere in the United States, and could be executed by a Federal marshal or any other officer authorized by law.

Generally, police officers have no power, including the authority to arrest, outside their geographical jurisdiction (see, *People v Lahr*, 147 Ill 2d 379, 589 NE2d 539 [Sup Ct Ill 1992]; *State v Stevens*, 26 Conn App 805, 603 A2d 1203 [App Ct Conn 1992], *affd* 224 Conn 730, 620 A2d 789; 6A CJS, Arrest, § 53; 5

Am Jur 2d, Arrest, § 69). Similarly, an arrest warrant issued in one State may not be executed in another because it has no validity outside the borders of the issuing State (*People v Hamilton*, 666 P2d 152 [Sup Ct Colo 1983]; 6A CJS, Arrest, § 53; 5 Am Jur 2d, Arrest, § 36). Thus, the New Jersey State warrant could not be executed in New York.[1]

These limitations on the powers of State officers are reflected in our Criminal Procedure Law. Under the CPL, warrantless arrests in New York may be made, in varying circumstances, by police officers (CPL 140.10), peace officers (CPL 140.25) and private citizens (CPL 140.30). Police and peace officers are also empowered to execute a warrant of arrest (CPL 120.60). However, these powers are territorially limited to New York State (*see*, CPL 140.10 [3]; 120.70 [1]). Police officers from a sister State, such as New Jersey, are not included in the definition of "police officer" (CPL 1.20 [34] [a]-[r]) or "peace officer" (CPL 2.10 [1]-[66]), and are, therefore, generally without statutory authority to arrest or to execute arrest warrants in New York. An exception to this rule is found in CPL 140.55, New York's version of the Uniform Act on Close Pursuit. This provision generally allows an officer from another State, who is in close pursuit of a suspect, to enter this State and arrest the suspect as if he or she were a New York police officer arresting a person for a crime committed in New York. It is conceded by all parties that this exception is inapplicable to the facts of this case.[2]

It has long been held, however, that police officers acting outside their jurisdiction retain all their powers as private citizens, including the power to arrest. Traditionally, a police officer may make a lawful citizen's arrest under the same circumstances as a private person (*see, People v Lahr, supra*; *State v Stevens, supra*; *State v Phoenix*, 428 So 2d 262 [Fla Ct App, 4th Dist 1982], *approved and remanded* 455 So 2d 1024; *see also, United States v Heliczer*, 373 F2d 241 [2d Cir 1967], *cert denied* 388 US 917; *United States v Viale*, 312 F2d 595 [2d Cir

---

1. I also agree with the suppression court and the dissent that the New Jersey officers could not execute the Federal arrest warrant in New York. Federal Rules of Criminal Procedure, rule 4 (d) (1) provides for the execution of a Federal warrant by a "[Federal] marshal or by some other officer authorized by law." However, there is no Federal statute permitting State officers to execute a Federal warrant outside their own jurisdiction (*see, People v Floyd*, 56 Misc 2d 373, *affd* 33 AD2d 795, *revd on other grounds* 26 NY2d 558), and New York law does not permit it.

2. New Jersey is also a signatory to the Act (NJ Stat Annot § 2A:155-1—2A:155-7).

1963], *cert denied* 373 US 903; 5 Am Jur 2d, Arrest, §§ 69, 71; Annotation, *Validity, in State Criminal Trial, of Arrest Without Warrant by Identified Peace Officer Outside of Jurisdiction, When Not in Fresh Pursuit*, 34 ALR4th 328). Thus, courts have consistently upheld arrests made by police officers acting outside their jurisdiction if those arrests could lawfully have been made by a private person (*see, People v Lahr, supra; State v Stevens, supra; State v Phoenix, supra; Commonwealth v Gullick*, 386 Mass 278, 435 NE2d 348 [Sup Jud Ct of Mass 1982]; *State v O'Kelly*, 211 NW2d 589 [Sup Ct Iowa 1973], *cert denied* 417 US 936).

In this case, the prosecution argues that the arrest was a valid citizen's arrest and relies on CPL 570.34 as authority. That section provides in pertinent part: "The arrest of a person in this state may be lawfully made also by any police officer or a private person, without a warrant, upon reasonable information that the accused stands charged in the courts of another state with a [felony]". The "reasonable information" requirement of this section, the prosecution contends, was met by the two arrest warrants authorizing the defendant's arrest for two felonies in New Jersey. They reason that since the New Jersey officers were clearly aware of these charges, this was a valid citizen's arrest.[3]

The dissent has adopted the defendant's position that this section of the CPL cannot be relied upon because the New Jersey officers had invoked their power as police officers in effecting the arrest, and, thus, were not acting as private persons. There is some authority for the proposition that police officers acting outside their jurisdiction will lose their status as private persons if they act under the "color of authority" (*see, Collins v State*, 143 So 2d 700 [Fla Ct App, 2d Dist 1962], *cert denied* 148 So 2d 280; *Commonwealth v Troutman*, 223 Pa Super 509, 302 A2d 430 [Pa Super Ct, 1973]). However, other courts have held that the arrest is not invalidated unless the officer uses the

---

3. The prosecution also contends that the words "police officer" in CPL 570.34 should be read to include New Jersey police officers, and therefore this statute authorized them to arrest defendant in their capacity as police officers as well as private citizens. This interpretation is rejected since, as noted above, the term "police officer" is specifically defined in the CPL, and does not include sister State officers.

Additionally, although this section authorizes a *warrantless* citizen's arrest, the fact that the New Jersey officers had two arrest warrants from other jurisdictions should not render this section inapplicable. Assuming the statute's other requirements have been met, it is not appropriate to penalize the officers for obtaining judicial process.

power of his office to obtain evidence not available to private citizens (see, State v Phoenix, supra; People v Lahr, supra).

Any arrest by a law enforcement officer, by definition, involves an assertion of official authority. If the use of any degree of official authority would always negate the officer's private person status, an officer could never make an extraterritorial arrest as a private person. This conclusion is contrary to the long line of cases permitting such arrests. Here, the New Jersey officers merely knocked on the door and identified themselves as police. Defendant then fled the apartment via the fire escape, prompting the officers viewing him from an adjacent window to yell "halt." Defendant was apprehended and returned to the apartment. Other than identifying themselves as police, the New Jersey officers did nothing that could not have been done by any private person. Further, it is uncontested that the evidence of defendant's possession of narcotics was in plain view to anyone inside the apartment. While it is true that the New Jersey officers acted in their law enforcement capacity in obtaining the warrants, and in obtaining the cooperation of the New York City police earlier that day, they gained no evidence solely by virtue of their official status. They simply made a warrantless arrest of a fleeing felon on a fire escape.

The argument that the arrest was still unlawful because private citizens are not authorized to make arrests in a home is not persuasive either. That contention is premised on the suppression court's incorrect findings that the police coerced defendant into fleeing onto the fire escape from his apartment, and that this was the "functional equivalent of an arrest inside his apartment" (People v La Fontaine, 159 Misc 2d 751, 763 [Sup Ct, NY County]). These findings are totally unsupported by the hearing evidence and the law. There is nothing to suggest that the defendant knew there were also officers on the fire escape when he elected to flee, nor is there any evidence of any coercive communications by the New Jersey police officers prior to his flight. Their only actions were to identify themselves as "police".

The cases cited by defendant to support his argument that his flight was precipitated by official coercion are clearly distinguishable (see, United States v Maez, 872 F2d 1444 [10th Cir 1989]; United States v Al-Azzawy, 784 F2d 890 [9th Cir 1986], cert denied 476 US 1144; United States v Morgan, 743 F2d 1158 [6th Cir 1984], cert denied 471 US 1061). In those cases there was clear evidence that the defendants were completely sur-

rounded by several officers, some with guns drawn, and were ordered to come out of their residence. Here, only the *presence* of the police, and perhaps his guilty conscience, led defendant to flee onto the fire escape. Also, defendant enjoyed only a minimal expectation of privacy in the fire escape outside his window (*People v Funches*, 222 AD2d 218, *affd* 89 NY2d 1005). The return of the defendant back into the apartment was necessitated by the fact that he was shirtless (as he had fled without one in the month of November), and the need to assist the defendant's crying two-year-old daughter, whom he had abandoned, unattended, in the apartment in his haste to escape. The arrest here took place on the fire escape when defendant was initially seized, and was not an arrest inside a residence.

Even were one to accept the conclusion that the officers' authority to act as private persons was negated by their act of identifying themselves as police, and therefore that the arrest cannot be a valid citizen's arrest, suppression would still not be warranted. The Court of Appeals has held that violations of statutory requirements in criminal prosecutions will result in the sanction of suppression of evidence only where a constitutionally protected right is implicated (*see, Matter of Charles Q. v Constantine*, 85 NY2d 571, 574-575; *People v Patterson*, 78 NY2d 711, 716-717). No such constitutionally protected right is implicated here. Defendant's claim that his arrest by an officer acting outside his jurisdiction was unlawful involves no fundamental constitutional considerations. The criminal statutes that confer the power to arrest, while related to search and seizure issues in a general sense, do not create a constitutionally derived right. There is no constitutional right to be arrested by a particular law enforcement officer.

While the Court of Appeals has not hesitated to approve the sanction of suppression in circumstances where statutory violations truly implicate the lawfulness of the search or seizure (*see, People v Taylor*, 73 NY2d 683 [failure to record or summarize examination in application for search warrant in violation of CPL 690.40 (1) required suppression because fundamental Fourth Amendment rights were implicated]; *see also, People v Gallina*, 66 NY2d 52; *People v Moselle*, 57 NY2d 97), it also has denied suppression in circumstances similar to those here. In *People v Sampson* (73 NY2d 908) and *People v Walls* (35 NY2d 419, *cert denied sub nom. Junco v New York*, 421 US 951), the Court refused to suppress evidence obtained by New York police officers after arrests of subjects in other States,

notwithstanding the officers' violation of those States' fresh pursuit statutes. In each case, the Court found that absent evidence that the officers willfully disregarded the sister State's statutory requirements, such nonconstitutional violations did not require suppression.[4]

At worst, the New Jersey officers violated procedural statutes that confer the power to arrest and execute warrants on a specific class of persons. Given the existence of the State and Federal warrants authorizing defendant's arrest, there is no viable claim that the defendant's arrest lacked probable cause. Therefore, the Fourth Amendment's protection against unreasonable searches and seizures, and the exclusionary rule remedy, are simply not applicable (*see, State v Mangum*, 30 NC App 311, 226 SE2d 852 [Ct App, NC 1976] [arrest by officer outside his territorial jurisdiction was a technical violation that does not require suppression since it was not an unreasonable search under the Fourth Amendment]; *see also, People v Hamilton*, 666 P2d 152, *supra; United States v Walden*, 490 F2d 372, *cert denied* 416 US 983; Annotation, 34 ALR4th 328, 334; US Const 4th Amend).[5] As the only violation here was statutory and not constitutional, the remedy of suppression is not mandated. Defendant's conviction is affirmed.

Accordingly, the judgment of the Supreme Court, New York County (Frederic Berman, J.), rendered December 10, 1993, convicting defendant, upon his plea of guilty, of attempted criminal possession of a controlled substance in the third degree, and sentencing him, as a second felony offender, to a term of 3 to 6 years, should be affirmed.

Tom, J. (dissenting). On this appeal, we are presented with the question whether out-of-State police officers have the authority to enter this jurisdiction, not in hot pursuit and not accompanied by local officers, to arrest defendant for a New Jersey crime pursuant to New Jersey and Federal arrest warrants.

---

4. In *People v Sampson (supra)*, the Court noted that defendant raised no constitutional argument regarding the authority of New York police officers to act outside their jurisdiction. Notwithstanding this statement, we perceive no viable constitutional challenge to the New Jersey officers' actions in this case.

5. That is not to say that the exclusionary rule is always inapplicable to actions by police officers acting outside their jurisdiction. Such officers are still State actors for purposes of the exclusionary rule (*State v Stevens, supra; State v Phoenix, supra;* 6A CJS, Arrest, § 12, at 20-21; Bassiouni, Citizen's Arrest, at 33-34 [1977]).

At the suppression hearing, Detective Ronald Humphrey, an officer of the Paterson, New Jersey, Police Department, testified. In August 1992, New Jersey police had obtained from the Paterson Municipal Court a New Jersey warrant for the arrest of defendant and one Miguel Ortiz, both fugitives, who were wanted in New Jersey for a charge of conspiracy to commit murder. In October 1992, New Jersey police obtained a Federal warrant from New Jersey Federal District Court authorizing the arrest of the same individuals for the Federal offense of flight to avoid prosecution.

On November 18, 1992, at approximately 8:00 A.M., New Jersey Detectives Maute, Caudrado, and Humphrey with Sergeant Stell traveled to New York City to execute the New Jersey and Federal warrants. They informed New York police officers at the 34th Precinct that they had information that defendant and Ortiz had been seen in the vicinity of 158th Street between Broadway and Amsterdam Avenue. Four precinct detectives accompanied the New Jersey officers on a search of the area, but the suspects were not found. The New York detectives then departed the scene and were advised by the New Jersey officers that they would continue the search.

At about 10:30 A.M., an informant directed the New Jersey officers to 600 West 163rd Street, apartment 34, a third-floor apartment. At about 12:30 P.M., the New Jersey officers staked out positions in the vicinity of the apartment: Stell remained by a hallway window from which he could observe a window of apartment 34; Caudrado was stationed at the second-floor fire escape below apartment 34; Maute and Humphrey attended to the front door of apartment 34. The two detectives knocked and, upon query from within, responded that they were "police." Immediately, the officers heard "shuffling" within, which sounded like furniture being moved. Caudrado and Stell, shouting "halt," saw defendant exiting the window to the fire escape. Defendant, shirtless, was apprehended by Caudrado as Humphrey and Maute arrived. Humphrey at this point heard a child, who turned out to be defendant's young daughter, crying within the apartment. They all re-entered the apartment through the window to obtain a shirt for defendant and to see whether the child was being attended to.

The officers took defendant to the kitchen, away from the distraught infant. Humphrey informed defendant that he was being placed under arrest on the basis of the Federal "fugitive" warrant. At that time, Humphrey observed a quantity of white powder, which appeared to be cocaine, in glassine bags

on top of the refrigerator. Defendant, and the contraband, were turned over to officers in the 34th Precinct. After being read his *Miranda* warnings, defendant stated that he had purchased the cocaine in New York. Defendant was indicted by a New York Grand Jury for criminal possession of a controlled substance in the third degree arising out of his possession of this cocaine.

Defendant moved to suppress the cocaine, arguing, *inter alia*, the absence of authorization for the arrest by the New Jersey officers. The hearing court found that the out-of-State officers were not authorized to act either as police officers or as peace officers under the Criminal Procedure Law, absent hot pursuit, and that such did not occur in this case. The hearing court also rejected the People's claim that, as private citizens, these "officers" were authorized to arrest suspects for known criminal activity. However, the court found the arrest to be lawful. The court concluded that insofar as the officers fit within the category of "some * * * officer authorized by law" under Federal Rules of Criminal Procedure, rule 4 (d) (1) to execute the Federal fugitive warrant, they could execute a Federal warrant nationally, irrespective of State borders. Assuming the validity of the arrest, the court found the cocaine to have been in plain view. The suppression court concluded that the officers had authority to execute the warrant of arrest and denied suppression.

Defendant was convicted, upon his plea of guilty, of attempted criminal possession of a controlled substance in the third degree and was sentenced, as a predicate felon, to a term of three to six years. Defendant is currently on parole from that judgment, but is incarcerated in the State of New Jersey. While I concur with the trial court's findings that these officers were not authorized to act as police officers under the Criminal Procedure Law, and did not act as private citizens, I would reverse.

The arrest of defendant by New Jersey detectives at his home pursuant to both the New Jersey and Federal warrants was unlawful. Suppression should have been granted as to the cocaine found in his apartment as well as his statement made at the 34th Precinct.

Historically, under New York law, the power of law enforcement officers to arrest was restricted to the geographical area from which the officer's authority was derived. To better appreciate the doctrine of territorial jurisdiction for police officers, an analysis of the historical development of the law is

instructive. At English common law, arrest warrants were of two types: either Kings Bench warrants, which were kingdom-wide in scope, or, more typically, warrants issued by a Justice of the Peace, which were limited to the county of issuance. In order to address the likelihood that suspects might flee to another county, common law early evolved a method of dovetailing the initial warrant with extraterritorial effect by the procedure of "backing", by which the Justice of another county affirmatively would endorse the back of the original warrant, giving it original effect in that other county. The authority of a law enforcement official to execute an arrest warrant was limited by the political authority of the Magistrate who issued the warrant, and by the geographic reach of the political unit by which he was employed (4 Gavit, Blackstone, Commentaries on the Laws of England, ch 21, at 871 [1941]; *see, e.g., Rex v Weir*, 1 Barn & C 288, 107 Eng Rep 108 [1823]; *Gladwell v Blake*, 1 Comp M & R 636, 149 Eng Rep 1235 [1834]). The doctrine of jurisdictional limitations on arrest warrants imposed by the borders of the authorizing political units was imbedded in the common-law underpinnings of American law. Early American common law adopted the doctrine (*see, e.g., Lawson v Buzines*, 3 Harr 416 [Del 1842] [constable's authority to execute arrest warrant limited by city magistrate's jurisdiction within city limits]; *York v Commonwealth*, 82 Ky 360 [1884] [although sheriff may, in writing, authorize someone else to execute a warrant, the sheriff, and his designee, are limited to the sheriff's own county; designee lacked authority to seize defendant in another county, and was liable for inadvertent killing of third party during the arrest]). Similar principles also were recognized in early New York law (*Butolph v Blust*, 41 How Prac 481, 5 Lans 84 [NY Sup Ct 1871]). The power conferred on local officials to arrest subsequently was defined by legislation in New York, and in other jurisdictions (*see, e.g., People v Hamilton*, 666 P2d 152 [Colo Sup Ct 1983]). However, in American law, the arrest warrant is, at root, a device to protect an individual from an unreasonable, and hence unconstitutional, seizure of the person (*see, Steagald v United States*, 451 US 204, 212 [1981]), especially when police seek to invade the privacy of the home *(supra; Payton v New York*, 445 US 573, 576 [1980]; *see also, Note, The Unwarranted Choice: Arrest Warrants and Problems Inherent in the Payton Doctrine*, 32 NY L School L Rev 169 [1987] [discussing constitutional distinctions between predicates for arrest warrants and search warrants]).

Since the defendant, a resident of this State, was arrested within the geographic borders of New York, the Criminal Procedure Law and the constitutional and statutory interpretations of New York courts establish the parameters necessarily governing the authority of a court to issue an arrest warrant and a police officer's power to arrest. In the present case, it is undisputed that no New York court issued or endorsed any arrest warrant. It also is undisputed that no New York police officer executed any arrest warrant. The question then is presented whether the New Jersey "officers" had any authority to effect an arrest in New York.

The warrant of arrest, to be valid in New York, must be addressed to either "police officers" or "peace officers" (CPL 120.10 [3]; 120.60). Those designated officers authorized to execute an arrest warrant are restricted in terms of their geographic and political jurisdiction (CPL 120.50), although the authority to arrest may be delegated by the officer employed by one political unit organized under New York law to an officer of another political unit within the State under appropriate circumstances (CPL 120.60). The authority of a "police officer" in this regard is defined by his or her "geographical area of employment" which, at its outermost boundary, consists of New York State (CPL 1.20 [34-a]).

CPL article 120 does not extend the power to arrest to out-of-State persons who are authorized to act as police officers within the boundaries of their own States. The evidence in the case at bar does not substantiate any claim that the New Jersey officers were deputized or acted in some agency relationship with New York police officers as a means of evading the clear fact that under the Criminal Procedure Law, out-of-State police officers are neither "police officers" nor "peace officers" for purposes of exercising lawful authority in this State (see, CPL 1.20 [34]; 2.10). Rather, for purposes of New York law, these officers ceased being officers of the law at the New York border, absent some precise exceptions not present herein.[1] Hence, as the majority concedes, absent other pertinent statutory authority, the New Jersey warrant could not be executed lawfully in New York by the New Jersey officers.

---

1. *E.g.*, CPL 140.55 (2) provides that any out-of-State police officer who enters New York in "close pursuit" of a suspect connected with criminal activity shall have the same authority to arrest such person as police officers of this State. However, the New Jersey warrant herein was issued in August 1992, the Federal warrant was obtained in October 1992 and the arrest of defendant occurred in New York City the following month, on November 18, 1992, so that, manifestly, the officers were not in hot pursuit of defendant.

The People cannot evade the restrictions imposed by the Criminal Procedure Law by relying upon the existence of the Federal fugitive warrant. When a State police officer makes an arrest of a suspect for a Federal crime, in the absence of an applicable Federal statute "the legality of that arrest is to be determined by the law of the state in which the arrest takes place" (*United States v Taylor*, 797 F2d 1563, 1564 [11th Cir 1986]). In this case, "the New York statute provides the standard by which this arrest [executed in New York for a Federal crime] must stand or fall" (*United States v Di Re*, 332 US 581, 591 [1948] [warrantless arrest]; *see, United States v Watson*, 423 US 411, 420-421, n 8 [1976]; *see, United States v Bowdach*, 561 F2d 1160, 1168 [5th Cir 1977] [Florida arrest by Florida police on Federal warrant; same rule, regardless whether arrest was executed pursuant to a warrant or was warrantless]). Although New York police, acting pursuant to New York law permitting execution of a Federal fugitive warrant, could have made a valid arrest, otherwise assuming the propriety of their conduct (*cf., United States v Bowdach, supra*), insofar as the New Jersey officers, acting without New York authority, could not lawfully execute a warrant in New York absent enabling legislation, the arrest remains unlawful. Neither *Bowdach* (*supra* [Florida arrest by Florida officers on Federal warrant]) nor *United States v Polito* (583 F2d 48 [New York arrest of Federal parolee by New York officials]), relied on by the People, supports a contrary conclusion. Although Federal Rules of Criminal Procedure, rule 4 (d) (1) authorizes execution of a Federal warrant by a Federal Marshal or some other "officer authorized by law", for reasons explained above, these New Jersey "officers" were not authorized by New York law to execute any warrant. 18 USC § 3041 specifically authorizes arrests of Federal offenders by officials of States "where the offender may be found," i.e., New York. Since Federal law does not expressly authorize the New Jersey officers in this case to execute the Federal warrant in New York, the analysis necessarily returns to the law of the State where the arrest is conducted—New York—which, for reasons stated, invalidates the subject arrest. Because the officers lacked statutory authority to arrest the defendant under the circumstances of this case, the arrest cannot serve as the constitutional predicate for seizure of the contraband, whether in plain view or not. Since the arrest on the fire escape, for the New Jersey offenses, was unauthorized, the consequential entry of the home, and the seizure of contraband, which is the basis for the separate New

York offense, also was invalid. The indictment must be dismissed.

There is authority for a warrantless arrest of a fugitive from another State without preliminary criminal court process (CPL 570.34), subject to prompt subsequent local criminal court ratification of the arrest. However, in terms of the actual status of these "officers", as well as the circumstances of the arrest, the seizure of defendant's person here was unlawful. The exercise of the authority to conduct a warrantless arrest is limited to "private person[s]"—in which capacity these officers did not act—and "police officer[s]"—in which capacity these officers also did not act under New York law. Furthermore, this was not a mere encounter on the street or in another public place.

In the present case, the arresting officers clearly did not effect the arrests of defendant in the capacity of private citizens. On this point, I would sharply dispute the majority's conclusion as well as its reading of the facts. Moreover, the majority contends that other than identifying themselves as police, these "officers" did nothing that private citizens could not do. This construction, though, misses the point: private citizens cannot hold themselves out to be police officers in order to assume the authority conferred by that status (*see*, Penal Law § 190.26). The New Jersey officers, having acted under the cloak of their authority as police officers, could not, for purposes of evading the restrictions of the Fourth Amendment, retroactively be shorn of their uniform, figuratively speaking. There is no credible evidence to show that these officers, in putatively executing arrest warrants, acted, or even perceived themselves to be acting, as private citizens effecting a warrantless citizen's arrest (*see*, CPL 140.30, 140.35, 140.40). The evidence clearly supports the conclusion that the New Jersey officers invoked the power of police authority in executing the arrest of defendant pursuant to a New Jersey and a Federal warrant and that defendant submitted to their authority as police officers.

Further, even if the "officers" acted as private persons, the statutory authority to conduct a warrantless arrest of a fugitive under CPL 570.34 does not confer upon private persons the additional right to enter or to demand to enter private premises to make the arrest and to seize contraband. The facts also leave little doubt that, had defendant answered the door rather than fled through the window, the "officers" would have entered the home to effect the arrest. Nor was defendant merely seized on the street; he was flushed out of his home by officers acting under color of authority. Although defendant's

privacy interest in the fire escape outside his window was limited, the fact of such an interest, coupled with the police action that prompted the flight, elevates this case above a mere street encounter with private citizens. Moreover, a private citizen has no authority to enter private premises, without permission, and seize contraband whether or not it is in open view. To allow "police officers" lacking valid arrest authority to adopt the expedient of private citizenship, while acting under the color of police authority, to effect an otherwise invalid arrest on behalf of New Jersey in real measure vitiates the constitutional bar against unreasonable seizures. Such a constitutional end run begs the question of why out-of-State agents, possessing questionable credentials, would bother submitting to New York law. The potential for abuse is manifest.

The majority characterizes the warrantless arrest as a mere statutory error, invoking no constitutional violation and for that reason excusable. With this conclusion, I also respectfully disagree. In the first instance, an arrest is " 'quintessentially a seizure' [citation omitted]", necessarily triggering Fourth Amendment requirements (*Payton v New York, supra*, at 585; *United States v Watson*, 423 US 411, 427, *supra* [Powell, J., concurring] ["duly authorized law enforcement officer" may make warrantless arrest in "public place" even in the absence of exigency]). The absence of authority to seize a person as a component of State action is no mere procedural oversight. Although the manner in which a warrant is executed is governed by statute, the power to seize that person is circumscribed by constitutional limitations.[2] Similarly, statutes may itemize the instances when a warrant may be dispensed with, but the codification of such exceptions necessarily is grounded in constitutional precepts.[3] From the conclusion that these officers acted under color of authority, and not credibly as mere private citizens, it necessarily follows that they required a constitu-

---

2. *(Payton v New York, supra)*. The majority would have to agree that, if this warrantless arrest had occurred, in the first instance, inside the home, it would have been presumptively unconstitutional (*Payton v New York, supra*, at 586-587). Even though the defendant's exit waived *Payton* protections (*compare, People v Levan*, 62 NY2d 139), this does not exempt arrest authority from the constitutional requirement of reasonableness.

3. Parenthetically, there was no exigency in this case: the officers were directed to defendant's residence, there was a significant lapse of time between the New Jersey events and the arrest and there is no indication that defendant was aware that they had located him (*cf., People v Mealer*, 57 NY2d 214, *cert denied* 460 US 1024; *cf., People v Gordon*, 110 AD2d 778 [2d Dept 1985]; *cf., United States v Campbell*, 581 F2d 22 [2d Cir 1978]). Exigency refers to "those situations in which law enforcement agents will be unable or

tional predicate to seize defendant in the manner in which he was seized. While the statutes upon which the majority relies do impose procedural requirements in connection with arrests, and also provide exceptions thereto, these statutes, as with all criminal statutes, follow from the underlying constitutional authority of a State to effect an arrest. Whether or not a procedural irregularity may be excused does not answer the question whether the officers, *ab initio*, could exercise the power of arrest on behalf of the State of New Jersey. If they could not, then defendant and the evidence both were unlawfully seized.

The majority's reliance on particular case law, which stands for the proposition that mere statutory errors do not necessarily invoke the exclusionary rule, illustrates the sharp distinction between our respective positions regarding the power of these officers to arrest the defendant. They also are factually distinguishable. *People v Sampson* (73 NY2d 908) involved New York officers going to Vermont to question a Vermont resident who was a suspect in a New York homicide. The decision specifically states that the officers had no intention of making an arrest at that time and entry into the home was on consent. By happenstance, during the interview (there was no issue raised concerning the propriety of the questioning), defendant started blurting out a confession. The officers had no obligation not to hear the self-inculpation, so that there was no valid reason to suppress the statement. Defendant raised no constitutional claim in connection with the power of the New York officers to make the arrest but argued only that suppression was warranted by reason that the New York police failed to follow Vermont statutory guidelines in arraigning him. In *Sampson*, the statutory error arose from the officers' subsequent transport of defendant to New York without remanding him to the custody of Vermont authorities for arraignment. Thus, the relevant inquiry was not whether the arrest was valid, as in the case at bar, but whether the New York custody and subsequent prosecution became invalidated by a failure of the officers to take further steps under Vermont law.

In *People v Patterson* (78 NY2d 711) the statutory irregularity arose from the use of a photograph that should have been returned to the defendant after a prior prosecution for a different offense, when that prior prosecution terminated in the defendant's favor (*see,* CPL 160.50). That photo was used

---

unlikely to effectuate an arrest * * * for which probable cause exists, unless they act swiftly" (*supra,* at 25).

subsequently in a photo array, and upon its selection by the victim, defendant was arrested. While the defendant did argue that his constitutional rights were implicated, in that the in-court identification was tainted by use of a photo that should not have been used as the preliminary identification tool, the Court of Appeals found no constitutional violation: the sealing requirement was purely statutory. Defendant did not otherwise demonstrate constitutional error in the identification proce-dure: there was no suggestiveness in the procedure, and the photo was not originally taken in an improper manner. No "fundamental right" was at stake. Hence, for the "technical violation" of CPL 160.50, suppression was not warranted. *Matter of Charles Q. v Constantine* (85 NY2d 571) followed from *Patterson. Charles Q.* was a CPLR article 78 proceeding com-menced by a fired State Trooper who had been acquitted of re-lated charges after a criminal trial. The motion court errone-ously authorized the unsealing of the petitioner's criminal record, a violation of CPL 160.50. However, this statutory er-ror, which was not relevant to a seizure of the petitioner, did not require suppression in the article 78 proceeding.

Manifestly, these rulings do not resolve the conflicting interests of the New York resident to be free from an unautho-rized seizure, and of a State to conduct an extraterritorial ar-rest. The critical factor in the present case remains: there was no authority for these persons to conduct the arrest in New York, *ab initio*. Since the powers of this State were not invoked in effecting the arrest, which is a jurisdictional impediment, the arrest of defendant and the subsequent seizure of the contraband were invalid.

The dissenter in *Patterson* (Titone, J.), finding a "gross viola-tion of law" (*supra,* at 722), would have suppressed, noting that, otherwise, there would be no adequate remedy for the violation. So, too, albeit under more compelling circumstances, in the present case: what remedy would there be for unautho-rized arrests by agents of another State if suppression is not warranted?

SULLIVAN and WALLACH, JJ., concur with MAZZARELLI, J.; MURPHY, P. J., and TOM, J., dissent in a separate opinion by TOM, J. Judgment, Supreme Court, New York County, rendered on or about December 10, 1993, affirmed.